has suffered real harm as a result of Georgia's ever-increasing consumption of upstream waters, and second, that Georgia's consumption is unreasonable    and largely unrestrained. In fact, the Special Master found that Georgia's position, practically, politically, and legally, is that it can consume as much water as it wishes without regard to any of the long-term consequences for the Apalachicola region. The Special Master nevertheless concluded that this case should be terminated at the outset and that Georgia's wasteful consumption be allowed to continue unabated because Florida had failed to show an adequate certainty of complete relief. With respect to the Special Master, we believe he made a legal error on this discreet issue that the case should be returned to him for him to complete the work that he has begun. Ginsburg. I thought that the Special Master, and this is at page 63 to 65 of the report, said that Florida, at the trial, concentrated only on the harm from the low flows in drought years, and it did not address the benefits of increased flow during normal non-trial periods. It didn't even address it, he said, and no less showed the benefit that it would gain. So he said if Florida has not established its case, it's Florida's fault, because all they did was concentrate on the drought years. Right. And I think, first of all, the Special Master's entire report has to be viewed in light of the legal standard of addressability that he applied, and we believe that he applied far too great of a standard. Second of all, I think it is fair to say that Florida's presentation was focused on the harm that we suffer during drought conditions in the extreme low flow periods. But two things about that are important to understand. There's two ways to address that harm. One is to provide more water during those periods, the extreme low flow periods, the worst of the worst, and the other way is to reduce the frequency and severity of those drought operations. And the United States, even the United States in this case, and it's at page 28 of its brief, recognizes that a decree in this case limiting Georgia's consumption would benefit Florida by reducing the frequency, severity, and duration of drought conditions. Now, we think that that benefit Where does the record show that? That we would benefit from that? Well, what I can point you to, for example, is the 2012 drought, and we've explained this in the evidence sites at pages 48 to 49 of our brief. And what that example shows is that if more water had come into the system during the 2012 drought, which is one of the worst that the region has experienced, it would have meant that the Corps would not have dipped into its drought operations during for nine months during that period, which means that the Corps would not have fallen into the red zone where all the sort of needles are at the far end of the spectrum for nine months during that drought. And that has to have resulted in beneficial effects. So here's my difficulty, Mr. Garrett, with this argument, and it's especially with respect to this exception 2D, I think it is, is that you have common sense on your side. I mean, you say, well, it has to have shortened the drought or, you know, surely we would have gotten more water and that would have been beneficial to us. But there seems to be a real dearth of record evidence, specifically quantifying how much more water you would have gotten, exactly what benefits would have followed from that. It just doesn't seem as though Florida put that into the record, even though you kind of want to say, well, that must obviously be true. OK, well, first of all, I agree with you. It obviously has to be true. Second of all, let me give you some more. I guess what I'm saying is that's your first reaction, but there must have been some reason why it didn't put that into the record. Right. So let me give you some more evidentiary sites. And then before I do that, let me just point you to what this court said in the Idaho 2 case, Idaho versus Oregon 2, which the court said that uncertainties about the future do not provide a basis for fashioning the relief. And I think overall, that's the central principle that's critical in this case is, of course, allowing more water through is going to be a good thing. But this Court has never had a situation where it's recognized a State is being injured, it's recognized that the upstream State is wasting a resource, and it's recognized that the evidence shows that relief is possible and, indeed, likely, and the Court has said, nope, too bad, we're going home. And so let me get back to the evidence. But in this case, Mr. Gar, the special master said, yeah, there was proof on that point, but it was put in by Georgia. And Georgia's expert said it wouldn't make enough of a difference to cure Florida's problem. Garrett, Well, and I'm going to get back to the evidentiary sites. But on that, Justice Ginsburg, and just to be clear, we think that one of the special master's central error was to deal with all of this on the basis of a threshold redressability inquiry, and that instead what this should have done is gone to the equitable balancing stage of the equitable apportionment proceeding, where the special master would have to make all the findings that he did not complete on the costs that Georgia would incur of a decree, the full range of harms that Florida has suffered. He didn't complete those findings. Kennedy, You do agree that you have the burden to show redressability. Garrett, We have the burden like any plaintiff to show redressability in the Article 3 sense, Justice Kennedy, and we think that we meet redressability under any conceivable standard. Now, I think when you get into the equitable balancing stage, I actually think that the burden shifts to Georgia at that stage, because if we've shown, as the special master acknowledged that we have, that we have suffered real harm as a result of Georgia's inequitable conduct, then at that point, under this Court's precedence, Colorado v. New Mexico in particular, the burden shifts to Georgia. But I think you would say you do not have the burden, once you've shown the injury, to show that a consumption cap can help cure the problem. You do not have the burden to show that? Garrett, I think we do – certainly we have to show that a consumption cap is going to work. And the question is, by what standard? Do we have to show that a near certainty standard? Sotomayor, It is very critical for me that you go through the evidence of that. Garrett, Yes. Sotomayor, Now, just so correct me if I'm wrong, the special master made two findings The first one was that in drought periods, you didn't prove that the corpse, the corpse would release more water. The SG agrees with that and says, under the protocols in place, during drought periods, you're not going to get more water by a consumption cap. Putting aside whether that's close to the gravel situation or not, I'm really not addressing that, but I do want to go to the non-drought time. And as I read his report, he does say there was no evidence of the cap providing you with more water. And in fact, I did find plenty of evidence of that. So I'm not quite sure. And he discussed some evidence and rejected it as meaningful. So point me to evidence he didn't discuss and explain why it's meaningful. Garrett, Sure. I mean, first of all, just to be clear, if Georgia's consumption is limited, it's going to result in more water in the system, and that water is going to flow through. Sotomayor, That's Justice Kagan's logic. Garrett, Well, no. The special master recognizes that because, for example, on pages 6 and 37 of his report, he recognizes that the Woodruff facility is a run-of-the-river facility. Water is going to go through. The United States recognizes that on page 33 of its brief. Sotomayor, They agree with you. Garrett, That water is going to go through. And so if we're talking about the non-drought periods, what I would point you to, for example, is the 2016 Biological Opinion by the Fish and Wildlife Service. It's JX168 at page 50, where it talks about the benefits of additional water coming into the system. I would point you to the Hohen Direct Testimony at paragraph 53, where it talks about the benefits of having additional water come through to help reduce the salinity for the mussels. I would point you to the Allen Direct, paragraph 3D, where it talks about the benefits of even modest additions of waters in helping to halt an irreversible cycle. I would point you to the White Direct Testimony, paragraphs 164, where it makes similar claims about this. These are all supporting. Sotomayor, I agree. But where do they quantify it to show that the improvement would be meaningful? How do they show that? Garrett, All of those talk about how adding additional water, even in non-drought periods, helping the system rejuvenate, is going to have a meaningful, beneficial effect. Do they have a precise? Sotomayor, And so your argument about the standard is that you didn't have to prove the exact amount, you just had to prove that it was meaningful? Exactly. And this Court said exactly that in Colorado v. New Mexico, where the Court said that absolute precision is not required. Instead, this is an equitable proceeding governed by broad and flexible. Mr. Garrett, you talk about a burden-shifting regime, and I want to understand your thought on that a little bit more clearly. So once you show that there are benefits, you think then what happens? Well, actually, I think, and this is laid out in Colorado v. New Mexico, footnote 13, I think, is, first, we have the burden, by clear and convincing evidence, to show that we have suffered real harm as a result of Georgia's upstream consumption. Once we meet that burden, the special master, I think, concluded that we did, or he assumed we did, at the very least, then the burden shifts to Georgia, essentially to show that the cost of the decree would be so much that they outweigh the injury that Florida is suffering. And part of that inquiry — So does the burden ever shift back to you to prove your case at the end of the day, that the benefits you seek outweigh the harms you cause? Well, I — Or does the burden ultimately rest with Georgia as a defendant, in your view? And can that be right? First of all, I think whichever way you think the burden lies at the end, we meet it under the correct redressability standards. Second of all, I think what this Court has talked about is when you get to that equitable balancing stage, the burden is on the diverting State to show that it's — that it's either a cost too much or it's not worth it. I had thought — I had thought that the burden ultimately was for the plaintiff who wishes to alter the status quo to show that the benefits he wishes to obtain significantly outweigh the harms that the relief he seeks would cause. Well — Am I wrong about that? I think you are under Colorado v. New Mexico, but if you are right about that, Your Honor, I think that we have met that and that the special mask is — Okay. Help me with that. Assume I'm — I'm stuck on that standard. Sure. How do you meet that high threshold seeking — seeking this Court's equitable — First of all, assume no change in the core operations. The United States itself recognizes, and this is at page 28 of its brief, that a decree limiting Georgia's consumption is going to benefit Florida because it's going to reduce the frequency, severity, and duration of the worst possible periods, the drought conditions. That's point number one. The second point is, is that the United States has reckoned — the Army Corps of Engineers and the United States have recognized that if this Court were to enter a decree in this case, the Army Corps of Engineers would review that decree and would adjust its operations accordingly so that — Well, let's just stick with the non-drought operations, okay? Assume my standard, how do you win under the non-drought years? I think we have to show that it is a likelihood of at least partial redress. And I think that we have shown that because — Assume that. Let's go to the real question, which is, if it's your burden to prove the balance, assume that. How have you shown that the benefit to you is greater than the cost to them? Okay. Thank you. First of all, Justice Sotomayor, to answer that question, you have to know what the costs to them are. And there's a dispute between the parties about that. They argue in their brief it's going to cost them $350 million a year. In fact, our witness, Mr. Sundin, put on evidence it was going to be $35 million a year. And the Special Master didn't make findings on that because he short-circuited the — So is that your real beef, then, that at the end of the day, that the Special Master went off track on redressability with non-drought years, you have redressability, and that he should have, therefore, conducted a more thorough balancing test in weighing the equities on the non-drought years, at the very least? Yes. Ultimately, that's what we think should happen next. And in that proceeding, what you would take into account is, okay, what's the full extent of Florida's injuries? The Special Master has found that we've been gravely injured with respect to oysters. He didn't make findings on the threatened Gulf sturgeon or the threatened mussels in the Apalachicola River. He didn't make those findings yet. But again, this goes back to my first question. Suppose the Special Master thought, you know, I can't even begin to do a cost-benefit analysis in the way that you would have liked them to because Florida hasn't shown that they're going to benefit at all. So it doesn't matter what the costs are with respect to Georgia. They could be fairly minimal. But Florida hasn't put on any evidence that they're going to get enough water as a result of that, that would improve their ecosystems, improve the oyster beds, or so forth. And without that, I can't go forward. Your Honor, there was significant evidence put in through our witnesses, for example, Dr. Hornberger, about the benefits of the water coming through in the ______. Well, there are two kinds of evidence that you might be talking about. One is evidence saying a lot more water would help our ecosystems. And I think that there is a fair amount of evidence with respect to that. But there's a prior question, which is exactly how much more water would you get if these caps went into place? And that's the place where it seems to me that there's kind of a vacuum. Well, I don't think so. And, you know, what I'd point you to, for example, is the United States post-trial brief. If you look at page 19 of that brief, I think, it recognizes that during low-flow periods, not the extreme low flows, but the low flows bumping up on the worst possible harm, during that period, additional water coming in would go through to Georgia. And the example that it has is if you had a flow rate at the border of 6,000 CFS and additional water coming through of 2,000 CFS, that you then have 8,000 going through. That's a lot of water. And our witnesses overwhelmingly show that that kind of water was going to have a significant impact on the water in the Alachicola River. And I think, again, going back to the stepping — taking a step back in terms of what we have to show in this proceeding, this Court has always made clear in this setting that uncertainties about the future are not a basis to provide a brief, a decree that absolute precision is not required, and that's because this Court is in the realm of equity. This Court has never had a situation where it's found harm, it's found inequitable conduct, and it's found that relief is possible. I think you have to conclude on this record that relief is possible. And the Special Master, the error that he committed, and I would agree with Justice Gorsuch on this, is he got off track on this threshold redressability ruling, that instead he should have continued the good work that he had done, made all the findings in terms of all the harm that Florida suffers, the costs that Georgia is going to incur from a decree, and then determine whether or not a decree, inequitable apportionment, should be entered. Now, if I could go to the Army Corps of Engineers, because I do think that this is a separate basis for finding redressability, and to be fair to the Special Master, he didn't have the benefit of this, and that's the record of the decision that was issued about six weeks after the Special Master made his recommendation here, where the Army Corps of Engineers said if this Court enters a decree in this case, it would review that decree and adjust its operations accordingly.  Yes, Your Honor. And I think that's on page 18 of that document. And the United States importantly recognizes in its brief, at page 30 of its brief, that that, that a decree, in this case, would form a part of the constellation of laws that the Army Corps of Engineers would have to look to in order to decide how to respond to that. We don't know what the Army Corps of Engineers is going to do, but I think common sense would tell you that any good government actor would look at a decision by this Court and seek to adjust its operations in a way that would facilitate that decree. And you can just take the Army Corps of Engineers' word for it. At page 4 of that document, the record of decision, the Army Corps of Engineers says that it has continually, continually asserted its preparedness to implement an agreed-upon formula by the States. And that's certainly consistent with the Army Corps of Engineers' statements over time. And then it also goes on to say that the same formula could be instituted by Congress or by the Court. Now, the Army Corps of Engineers, again, it has continually asserted its preparedness to implement a decree. And that makes sense because, as the government has recognized in this case, a decree equitably apportioning the waters is only going to result in more water in the system and make it easier for the Army Corps of Engineers to accomplish its objectives. So then the question is, what would the Army Corps of Engineers do with that water? Would it somehow stash it away or just send it to Georgia? Or would it look at the decision by this Court in this case and seek to facilitate that decision rather than frustrate it? I think everything would tell you, including the words that I just quoted from the Army Corps of Engineers' own decision, that it would seek to facilitate the decision. And that in itself should provide redressability. The only way that it wouldn't provide redressability is if we have to show a certainty of complete relief today. This Court has never required that. If you look at your redressability cases like Bennett v. Speer and Utah v. Evidence, this Court has treated situations where even though the government wouldn't be formally bound by a decision by this Court, it's recognized that where that decision would change the laws under which the agency would have to operate, as was true in Bennett v. Speer, that that was sufficient to establish redressability because that made redress likely. And I think I've pointed you, Justice Kagan, to evidence in the record. I would encourage you to read Mr. Hornberger's testimony and other testimonies about the benefits of additional water. But I think you haven't answered Justice Kagan's question, Ho. I accept there's plenty of evidence on the benefits of additional water. She seems to be saying the link that you haven't proven is that by putting it in the Oh, okay. Well, that I think is her question. That's mine, too. Okay. I mean, first of all, I don't think the special master disagreed with the notion that the water is going to go through. I think that he accepted that. And I think if you look at pages 6 and 3. Kagan quantified how much water you were going to get as a result of these consumption caps. And I think, again, I think we did. I think if you look at the testimony, the Hornberger testimony in particular, other testimony on that, the amount of water, there certainly was a dispute between the parties. If you have those sites, mention them. You've mentioned Hornberger. And I think, again, I mean, all of the special master, the lens that he was looking at the record in was whether we had shown that there was a guarantee that the Corps would exercise its discretion in a particular way. And he concluded that we haven't shown to certainty that the water would get through. Do you have another site besides the one you've mentioned? Well, in terms of the water that would go through? Yes. I also would point you to the government's brief that recognizes on page 33. It doesn't quantify it, though. Well, we're talking about our case was focused on showing that a consumption cap would result in anywhere from 2,000 to 1,000 additional CFS flowing through and that the limits we put in place. And I think the evidence is very specific when you get into it about that water going through. I see. So you're saying the drought information holds true at minimum for the non-drought one. Well, that holds true for the water going through. And then there are two questions. And then the question becomes, when is that water going to go through? And on that, I think first you have to take as a given that water going through even outside of those drought periods is going to reduce the frequency and severity of the drought periods, and that in itself is relief, it's meaningful relief. And the government recognizes that at page 28. On the question of water going through in drought operations, we put in evidence, substantial evidence about how the court has released, made discretionary releases of water at the Woodruff Dam, even in drought operations going back decades. And it also gets to this question of how would the court respond to a decree in this case? And in a sense, I mean, the court is in an unusual situation here where there's sort of a chicken and the egg problem. You know that you have a serious problem here. The Appalachia-Cola region has suffered serious harm. Not only have its oysters been decimated, but really a way of life. So really what the issue is, let me see if I understand it. You claim that, I have to go back to the report and read it now to find this, that the special master accepted that a consumption cap of 1 to 2,000 at minimum would flow through drought and non-drought years. Well, I think, let me say it this way. I think the special master did find that we didn't prove to a certainty, a certainty, and there was no guarantee, that's what he said on page 69, that the Corps would allow additional water through drought. Sotomayor, I know it's what it said. Right. I don't care about what happens with the Corps. I'm saying, did he find that the consumption cap would release a certain minimum amount of water that would get to the Corps? He, he didn't, he certainly didn't frame it this way, that way, Your Honor. In terms of, you can't say that I found that X amount is going to go through. I don't think he was, he felt himself. Is your view, Mr. Gar, talk about non-drought operations. Sure. All right. Is your view that if a consumption cap saves 2, you know, saves 2,000 cubic feet of water, that all of that necessarily gets through to Florida? Yes. I mean, that's the way. Just by physics. By physics, exactly. And eventually it's going to get through. The United States says it right in page 33 of its report. I mean, that's true. But the question, the mystery to me, and I have only one question which I could ask all three groups of lawyers, is why isn't the United States in this case? I mean, they have, they give mystical answers. I mean, I don't understand it. As I, maybe I don't, look, as I understand the whole thing, imagine that I'm standing south of the woodruff in that Apalachicola Bay or the river. I'm standing there in the south, okay? And suppose about 2,000 cubic feet comes from the Flint River. And now what the Corps will do with the other river, which is the Chattahoochee, it'll make certain it gets up to 4,500. So they put in 2,500. Now, if one day instead of 2,000 in this drought period comes down the Flint, 3,000 comes down the Flint, why in heaven's name doesn't the Corps send a little less and a little more? In other words, what they're thinking is, well, if 2,000 comes down, then the Corps will reduce the part that it sends down the Chattahoochee by 2,000. That's a pretty tough position. Wouldn't they be a little grateful? Wouldn't they think anything of the oysters? Wouldn't they say, let's at least give them a teaspoonful? We've saved 2,000 cubic feet of water, so let's give them a little bit of it. Now, the obvious people to answer that question is the Corps. And whereas the other case wants to get rid of them, in your case, you don't want them. But I would like them here. So I could ask them that. You're not even going to give them a teaspoon? What? And that's in the drought years. And in the non-drought years, we know there's a lot of extra water stuffed up there. You don't even have to get down into Zone 3, because so much is flowing down the Flint. Well, that's pretty good, isn't it? Because if you have a lot more in Zone 3 up there on the Chattahoochee, then you have more water to send down once the drought begins. And won't you do it? What reason is there for thinking you won't? OK? Now, that's as I understand this case, which I expect you to say, you're way off base, because I'd love to agree with you, but I don't. Or you might say, yeah, you're on base. That's the point, I wonder. Well, Justice Breyer, I think one way to think about the Corps' position in this case, which has evolved a bit over the years. Well, am I basically on base? I think you're on base to think that life would be a lot easier if the Corps had intervened. Yeah, but I haven't got this right. But I think one question is what the Corps has said to you in its brief, and the ultimate— Well, what the Corps has said to me at the moment, I'm assuming, is sort of vague. My question is whether my question was a good question. Well, yes. Without—absolutely, Justice Breyer. But I think what the Corps has said to you in its brief today, and I think that this in itself compels that you not accept the Special Master's recommendation, is that first, Florida would be benefited by a decree insofar as it reduced the frequency, severity, and duration of drought operations. That's on page 28. Second, they stand by the Corps' statement in its record of decision that they will review a decree by this Court and adjust its operations accordingly. And third, they recognize that that decree would form a part of the constellation of laws by which the Corps would have to operate. So there's every reason to believe that a decision in this Court imposing the decree that equity would demand would result in meaningful relief for Florida, and we were not required to show anything more than that to allow this action to proceed. If I may reserve the remainder of my time. Roberts. Thank you, counsel. Mr. Primus. Mr. Chief Justice, and may it please the Court. Florida has premised this entire case on the proposition that a cap on Georgia's water consumption alone would result in a material increase in water to Florida during drought without any change to Army Corps operations. After two years of discovery and a five-week trial, Florida failed to prove that case. Well, but I don't think they've premised it entirely on that. They've premised it on the fact that the Corps may change how it allocates water. That's what they say in the March decision. Quote, So, I mean, the decree granting Florida greater claims to the water will, at the very least, change the facts on the ground and, according to the Corps itself, cause them to adjust its operations accordingly. Mr. Chief Justice, we do need to distinguish between the two. The entire trial was over drought periods and what the Corps would do. The Corps just finished a 10-year process of creating a water control manual that determined that during times of drought, Florida is entitled to 5,000 cubic feet per second. That was blessed by the United States Fish and Wildlife Service, which studied the region and said that would be adequate to protect endangered species. And so what the Corps said in the record of decision and clarified in its brief in this Court is that, of course, it would review and consider a decree or an order of this Court, but it also said explicitly that it is not bound by an order of this Court and that it may not do anything. Right. And it reminds me of sort of the contract bidding discrimination cases, where you have someone who was discriminated against during the bid process. We don't require that person to show, well, if I hadn't been, I would have gotten the contract. We just say, if you show you were discriminated against in the process, you get a fair shot like everybody else. It seems to me it's asking an awful lot for Florida to have to say, we know that the Corps is going to change things the way it benefits us. Instead, they just want to say, well, look, they're going to make a different decision if they've got more water to allocate. You'll be able to argue that. And right now, they can't even argue that. Well, Florida can certainly argue that. The Corps has issued its water control manual. There is an APA challenge that has been brought to that manual. That case is proceeding in the district court of District of Columbia. Florida has not joined that suit. I suspect it's because the arguments that it would have to make in that suit would confirm that the Corps is, in fact, necessary to solve the problem. And so there's been a lengthy administrative process where Florida has made all the same arguments it makes in this court, and it chose not to challenge the water control manual in district court. They say, look, I have in front of you this slightly incomprehensible chart. And what I derive from it is that imagine now nothing is coming down the Flint River. And then tomorrow, because they convince the mayor of Atlanta or whatever to drink more Pepsi or whatever they drink, Coca-Cola, I imagine, and whatever reason that is, they say the 3,000 cubic feet comes down the Flint, OK? So now the Corps doesn't have to give 5,000. It can only, it need only give 2,000. See, so it has 3,000 more. Am I right so far? So far? I would quarrel with the hypothetical because there's no possibility of that much water being generated. I'm just using it as a big example, but it's some amount. It's some amount. I'm just using it as a big example. OK, I'll accept the amount. Now, they have a lot more water, say, in my hypothetical, 3,000 cubic feet. Now, what reason is there to think that they won't give a teaspoonful, they won't give a little bit at least, of that extra water they never thought they had to help the mussels and the oysters and the others down in Florida? What reason? It doesn't say in the chart what they'll do in that situation. All it says is that they guarantee 5,000 feet. They've got their 5,000. It happens that 3,000 is coming from Flint. And now, what will they do with that extra? And the answer, I think, is we don't know. They won't say. But you'd think if we're being equitable here, it would be equitable to give at least a little bit to Florida. Now, what's wrong with that? Justice Breyer, the Corps is governed by a panoply of Federal statutes, congressional dictates and mandates, as to how to control the water in this basin. And it's not as simple as if extra water comes in, then you just pass it through to Florida because they've articulated one concern. There are multiple interests in the basin. There are multiple stakeholders and multiple congressionally-defined purposes. Having studied this basin for a decade, the Corps has determined that in periods of drought and under its drought operations, when the reservoirs get to a critically low level, the Corps will release 5,000 cubic feet per second. And that's not just an accidental number. That number was chosen because that number allows the Corps to protect the endangered species downstream, as the Fish and Wildlife Service has said, but also to protect water quality, water supply in Atlanta, navigation, flood control, hydropower. There's a multitude of reasons. And you should be clear. Ginsburg. Can we agree that a cap, at the very least, would prevent the situation in Florida from getting worse? That is, that if we do nothing, then the situation in Florida can get worse, even worse than it is now. If there is a cap, then Florida is protected to at least to that extent. It won't get worse. Is that not so? That's not correct, Justice Ginsburg. In periods of drought, the Corps answered the question that it will continue to pass 5,000 CFS and store the remainder of the water saved by that cap in its reservoirs upstream until the drought. There are non-drought statements in their brief where they say the U.S. does not mean to suggest that a consumption cap would provide no benefit to the Corps' operation in the basin or to Florida. And they say, as explained to the Special Master, increased basin inflows would generally benefit the ACF system by delaying the onset of drought operations, by allowing the Corps to meet the 5,000 CFS minimum flow during longer, flow longer during extended drought, and by quickening the resumption of normal operations after drought. And, in fact, your adversary points to a lot of history showing that when there's increased water, the Corps gives increased water under its own protocol. The Corps says under its own protocols, when there's increased water during non-drought situations, more water flows to Florida. Isn't that their case? Justice Sotomayor, the Special Master at page 65 found unequivocally that Florida presented no evidence assessing the impact of a consumption cap on shortening the Corps' drought operations or on increased pass-through flows. I disagree. If I can point to, and your colleague has suggested, to a lot of record evidence, not just DSG's statement, but statements from Dr. Allen, Dr. Gilbert, Dr. Greenblatt, and from other experts showing that. Would we just say the Special Master was wrong or that he didn't explain why that evidence was inadequate? Well, he wasn't wrong. He was absolutely correct. All of the individuals that your Honor just mentioned are biologists or deal with issues like salinity. The people that Florida hired to assess whether water would pass through in these non-drought shortened drought operations periods were Dr. Hornberger and Dr. Shanahan. Neither of them provided any testimony on this issue. Well, Mr. Primus, how is it possible that it wouldn't pass through? I mean, if I understand what Mr. Garr said, it's something like this. If Georgia consumes 2,000 feet less of water, just as a matter of physics, it's all going to get to Florida. Now, there does seem, as you suggest, to be not all that much in the record showing that that's true. But it seems as though it should be true. Do you think it's not true? That all of that saved water will eventually go south? The water at the end is a question of timing and when the water will go south. During a drought, we know the Corps has answered that question. And all the evidence at trial showed that. But I was talking about non-drought. Correct. So let me address that directly. With regard to shortened drought operations, the evidence, Georgia did present evidence on this. Florida did not. And there's a reason. Because I think, Your Honor, one of Justice Breyer, you maybe used the word common sense. There's nothing common sense about the operations of this basin. It is incredibly complicated. There are five reservoirs. They're subjected to different rules by the Army Corps. They have different hydrologic conditions. They serve different purposes. That's why we create, or the Corps creates, complicated computer models. They're incredibly complicated. And both sides hired experts to evaluate the situation, your question, under the clause. Can you give me an example of how it would be that an additional 2,000 units saved in Georgia would not benefit Florida to the same amount? How would that be possible? Certainly. The problem is with the hypothetical. Because, as I said before, you cannot get 2,000 cubic feet per second. Georgia consumes a much smaller amount of water. And this is just in the agricultural part of the state. Counsel, with respect, I think you're fighting the hypothetical. Okay. And maybe you can direct your attention to the Corps' own statement and the SG statement, which Justice Sotomayor read. Maybe that will help move us along. Which suggests that in non-drought operations, there will be more water going to Florida, the federal government says, and that that will reduce the onset of drought operations. I would have thought, and maybe this is just where we're all stuck, is that's redressability, at least. And then you have to go weigh benefits and harms, which didn't seem to take place here. Justice Gorsuch, the United States, it says explicitly in its brief at 17 that those are hypotheticals, and they say also, this is a quote, not attempts to precisely quantify any particular effect. No, there's no precise quantification. But on page 28, they say that it, I'm not going to repeat it all again, but pretty darn clearly that they anticipate that non-drought operations, there will be more water going through, and that that will help diminish drought operations. Well, Georgia did quantify this. We ran the CORE's computer model, and we determined that as you add the water that could be saved, and Georgia didn't skimp. We modeled a 30 percent reduction in water use on the Georgia side of the line, and the truth is, is that the amount of water that that generates just does not move the period in which Florida goes, I'm sorry, when the CORE goes into drought operations. There's just not enough water given the capacity. No, but when you're in non-drought operations, how is it possible for the amount of water saved in Georgia not to benefit Florida? Okay. Well, let me, that's, I think, a different question. When there's plenty of water in the system, when there's rain, we're not in drought, Florida has not claimed it needs additional water. It gets plenty of water just through gravity and meteorology. That, and they've said in their papers. Well, there must be a set of months that are dry so that Florida wants more water, but not drought. And the CORE's operations account for that. And that's baked into the chart that the Special Master included in his report. But the important point is Florida, it's not a mistake that Florida didn't present this evidence, and I do understand the Court's statements. It seems common sense that it would shorten drought operations or make it fewer and farther between. Florida didn't present its modeling, because when Florida's expert, Dr. Hornberger, ran the ResSim model that the CORE uses, he tried a 50% cap, and it still didn't move drought operations. It still started in August. I have some kind in front of me, a Bedian Demo 13, do you know what I'm talking about, this thing? Yes. Okay. Well, that seemed to be Georgia, and they say 71 days in 2007, Florida would receive more water flow from a cap on Georgia's water consumption. So that's 71 days they get more water. 71 days they get more water, that means the CORE has to reduce less water. If the CORE has to, you know, the CORE can save water on its side in the Chattahoochee, right? And so if they have more water saved up there in whatever those zones are, one, two, and three, they are going to get into three later. And so if they get into three later, they have more water to give out later. Is that right? No, Justice Breyer. What I'm trying to tell you is that Dr. Bediant is the expert that Special Master Credit is. I know he was on your side, but that doesn't... But the rest of it, another part of his analysis shows that we don't shorten the drought operations, and those 71 days are small increments that don't benefit Florida. They're not material. They're random. Is there probably your answer is going to... But I don't like to turn this thing on who presented what and on what time. I mean, it's a serious matter, and a lot of people need the water, and there are all kinds of demands, and it ought to go really on not who said what and such and such, but what the merits really are. It's our case. Could we say we want a request, the SG, to provide material, experts, and have a hearing, and the hearing will focus on what would be best for the region, taken in light of all the demands, and Florida and Georgia and anyone else who wanted to, as an amicus perhaps, could participate so that the master can get a decision here about whether or not there should be or should not be less water going from the Flint to the grazing areas in Atlanta. Do you see what I have in mind? Is there some way of working that out? The court... I mean, not in Atlanta, south of Atlanta. The court surely has the power under its original... But would that make sense? It would not be for two reasons. One is that the Army court just went through that entire process. Everyone was heard, and there is an APA litigation ongoing today about just those questions that Your Honor articulated. The second reason is that, while I understand that we... Sotomayor, the government tells us that in its protocols, it's not charged with looking at the harm we're looking at, that it's not charged with looking at the harms to the So I don't think it's done a study that addresses the issues of the harms that are at in question in this litigation. That's not correct. The Army court, through the Endangered Species Act, does look at the mussels and the sturgeon that live in the Apalachicola River. It has said that the Apalachicola Bay is beyond its jurisdiction, and that's why, to Chief Justice Roberts' question, the court has said in page 2-62 of its final environmental impact statement that it doesn't have the authority without congressional action, which is to help the oysters of the bay. And that's why this case is an ill-fitting vehicle for that. But I do want to... Roberts. So what is the standard that you would require Florida to meet? Presumably, they don't have to show to an absolute certainty that, you know, they'll benefit in a particular way. But what do you think the standard is? The standard is that Florida should be required to show, by clear and convincing evidence, that its request... Where does that come from, by clear and convincing evidence? That comes from Colorado v. New Mexico and Colorado v. Kansas. It's consistent. Is that at the equitable weighing stage or as an initial matter, almost of standing? Well, this is not a standing question. This is a matter of equitable apportionment. The court has consistently said both in equitable balancing and at the preliminary stage of injury and benefit, that it's clear and convincing evidence. And that makes sense, given the sovereign interests of the States at issue. The court has consistently recognized that. Okay. I interrupted you. You were saying they have to show by clear and convincing evidence. That their requested remedy will provide a material benefit. And that is consistently mentioned in Washington v. Oregon. The court asked, is it materially more advantageous? In Idaho v. Oregon, the court asked, are there going to be numbers of fish justifying additional restrictions? And Colorado v. New Mexico put the burden on the State seeking to disrupt the status quo. The burden to prove benefits of the diversion must substantially outweigh the harms that might result. Now, Florida told the court, the special master at the beginning of this case, this is a quote from docket 125 to 29, if you conclude after a trial that caps on consumption will not redress Florida's harm, then Florida will not have proved its case. That's exactly what happened here. Florida did not prove its case. It did not prove that caps on consumption would redress their harm. But I mean, obviously, that depends on what you mean by redress. If the court came up and said, we will definitely review our running of the whole system in this basin, if the Supreme Court tells us that Florida, under an equitable apportionment, would get more water, we'll take another look at it, is that redress? It's not redress. It's too speculative. And the court requires clear and convincing evidence of the material benefit. But the court would have to go through a whole public comment process that has taken decades. And in that scenario, it's just as probable. Ginsburg. Why is that so? I think one of the things that we're told is that the court, although it may not be required to do so, has exceeded the minimum flows whenever water is available. So the core, the past history is it has exceeded the minimum flows when water is available. Well, in drought periods, it shoots for roughly 5,000 CFS. It's very hard to get it right at 5,000. Sometimes it exceeds it. Sometimes it drains. But why are we dividing drought and non-drought? If the water is eventually going to get to Florida, that will help Florida. And to say that it has to be immediately, well, that was one of the problems with the special master's report. He seemed to think that the benefit had to be immediate instead of eventual. Not immediate, but the time when the core is in drought operations can be very lengthy. And Florida, when the core is coming out of drought operations, there's plenty of rain. Florida has not made the case that it needs more water at a time when there's plenty of rain and water in the system. It just, that water just will wash out to sea and won't benefit anybody. When they really need it, and that's what the whole trial was about. I'm sorry, Mr. Chief Justice. Roberts. Just finish your sentence. What the whole trial was about was can they get it during a drought and the Army Corps and all the evidence shows conclusively that they cannot.  Thank you, counsel. Mr. Kneedler. Mr. Chief Justice, and may it please the Court. This case has proceeded from the outset on the premise that the Corps of Engineers operations have to be taken as a given, and any decree by this Court would not require a change in the Corps' operations. That flowed directly from the fact that the United States is a required party, but has not been joined because it can't, it hasn't waived its sovereign immunity. And therefore, the Court cannot order the Corps of Engineers to take any different operation. Roberts. Maybe we can order the Corps, maybe we can't, but surely you will. I mean, I understand that's what you say in the March 30. You're not going to ignore the determination by the Court that what Georgia has done is inequitable in irrigating to itself water that should be flowing down. Now, maybe at the end of the day you say, well, we've got other interests, we're still going to do this. But that would change the facts on the ground, wouldn't it? A decision from us? Yes, but let me explain the role of the Corps' operations here, because I think it's important. This is not an ordinary apportionment case where there is no act of Congress that has been involved. Here there is an act of Congress. Now, Congress, pursuant to its Commerce Clause and other authorities, can enact statutes or approve compacts that regulate or apportion water in a stream. In Arizona v. California, for example, the Court concluded that the Boulder Canyon project had directly allocated the water, and so there was nothing left for the Court as a matter of equitable apportionment to do. Here Congress has enacted a statute that doesn't directly apportion between the States, but it does heavily regulate this river system. If the protocols that are in the Corps' manual had been enacted into law, I think there's no question that this Court would have to respect that, could not order the Court to change it, and would have to take them as a given. Here what Congress did instead was to delegate to the Corps of Engineers the responsibility for balancing all those different interests, and to do so through an extensive public process that takes into account all the basin interests. The hydropower, which is one of the primary purposes of this integrated system of dams to begin with, flood control, Endangered Species Act, and also refilling water and being conservative, so if a drought is extended, that there will be enough water to serve all of those purposes. Congress vested in the Corps of Engineers the responsibility. Breyer. Why don't you just waive the sovereign immunity, get into this, and try to help the special master reach an equitable solution? For the reason that I said, that here you have an act of Congress that delegates the power to the Corps in the first instance. The Corps' judgments would be reviewed under the APA, under the arbitrary and capricious standard, after it balances all of the interests. It's not really a role for this Court to de novo determine what the role of the Corps of Engineers is in a situation like this. Sotomayor, what about a consumption cap? It changes the rules on the ground. It gives more water. In what ways does a determination by the special master that more water should come into the system negatively affect your discretion? Well, it depends how that plays out. As we say, I don't think the Court could order the Corps to take a different position. But under the Corps' own protocols, there are circumstances in which additional water that would be freed up would flow to Florida. There is not at the drought period, because the Corps has set a minimum in order to preserve water in case the drought is extended. But above the 5,000. We have taken no position on whether that extra release would actually provide a material benefit. Right. We have not taken we have not gotten. Why not? Could we ask you to take that position? I suppose you, the government could participate in that as an evidentiary matter, but it's. I ask a very specific question. Could we ask for an amicus brief that does that? I suppose you could. What do you think? In other words, what do you think we should do? Do you think we should? From the United States' perspective, we think that what we are not taking a position on whether Florida has shown that a cap would produce sufficient water to justify the cap in terms of benefits to Florida. Our interest here. But you do think, Mr. Kneedler, am I wrong? Your brief says that if there were a consumption cap, Florida would get material amounts more water. There would be additional water. It depends what you mean by material. Would they come at the right time such that it would produce a material benefit to the ecosystem in Florida? The claim of injury can't depend just on whether there is more water going through, but what would happen as a result of that water? Would the ecosystem be improved? And so that is the evidentiary question. Kagan. So suppose that we think that looking at the record that was before the special master, there was quite a lot of evidence that with more water, the ecosystem would be improved. Do you think, as I hear you, you're saying, and there would be more water. However much water is saved in Georgia comes to Florida. No, not that. That is not necessarily true because the core operates the five dams as an integrated whole, and it does so in part on basin inflow, but in part on how much water is stored in the reservoirs at any particular time of year. So there are certain situations looking at total basin inflow. For example, if more water came in from the Flint River, that would free up upstream for release during low flow periods. It's operated as an integrated whole. There is not a one-for-one tradeoff. And that's true even in non-drought operations. Yes. Right above drought operations, there is a period under different times of year from 5,000 to 10,000 feet, all of that flow would go to Florida. But there are other times when only 50% of the flow would go to Florida. There are still other times when none of the additional flow would go to Florida. That is under the protocol. But if the Court concludes that a cap within that, not taking that framework as a given, that a cap would produce additional water, the Court does not have a stake in that fight. I did want to address one point about the prediction, the question of how certain it is what the Court will do, the Corps will do. This is a different situation than the typical case where there is a third party and how likely is it that something will happen. Congress has adopted a separate statutory regime in which the Corps has to decide what to do with the range of additional water that may be available at any particular time. But I just — I'm sorry to interrupt, but it does seem fairly important. You say we can't order you to do something, but you've told us that you will take it into account. And it seems to me that that's arguably real redress to Florida, that you're going to take into account decisions saying that equitably they're entitled to more water, that Georgia is improperly taking its water. And you say you'll take it into account. Well, several things about that. To say that Florida is equitably entitled to more water can't ignore the regime that the Corps of Engineers has put in place, because equity follows the law in an equitable proportion. It's not the same as any other. So if the allocation that the Corps has made, I think, has to be taken as a given in the Court deciding what is an equitable portion. And Florida — Kennedy, you have said you don't have any stake in the argument about whether more water would help Florida. Can't we ask you that question when we're talking about your expertise? You say, well, whatever you decide, we'll use our expertise to follow. But then you don't tell us what to decide, and you're the experts. Well, the Corps is the expert through the process of the manual, which is exactly what Congress meant. The Corps — if this Court — going back to the Chief Justice's question, what would the Corps do if this Court entered a decree? First of all, if the Court entered a decree that Florida needed more water than the Corps of Engineers operation protocols right now provide for, that's really sort of inconsistent with the way this case began, which is that — that it was premised on the fact that the Corps' procedures would not have to be changed. And that's not to say that the — that I suppose the Court could decide to do that anyway and not go to the Corps. But we don't know what — I'm sure you've got this point. But, I mean, I don't know what to do without knowing what the Corps is likely to do. And I agree with you that it's Florida's fault. At the beginning, they said, we don't want the Corps in here. And now it seems like you're their best hope. All right. So that's why I seriously ask you the question, if you were sitting right here in my shoes, what would you do? Well, what — one course would be, if you agree that Florida has not made the showing that it said that it would make, that there would be material benefits from the increased flows. Florida has the ability to challenge the Corps of Engineers' master manual and say that it does not provide sufficient downstream flows for Florida, or to petition the Corps to adopt a new manual and revise it. It's not at all clear that the governing statutes even allow the Corps of Engineers to allocate additional water for the Apalachicola Bay, or that to do so would be consistent with balancing all the other responsibilities the Corps has. Thank you, Mr. Kneedler. Mr. Garr, two minutes. Thank you, Your Honor. First, the problem here is Georgia's consumption. The only way to address that is through an equitable apportionment. Second, we've heard a lot about the master control water manual. The record of decision itself says that the adoption of that manual, quote, in no way would it prejudice this Court in adopting an equitable apportionment. And I think the arguments we've just heard would result in a great deal of prejudice. Mr. Garr, what do we do with the special master's conclusion on 6566, where they credit the report by Georgia's expert, Dr. Bettendent, and Dr. Bettendent did a modeling and came to the conclusion that even if there was extra flow, it wouldn't materially change the environmental impact. Right. That's your greatest challenge. Special master was relying on the wrong addressability standard. The evidence, Bettendent was relying on a model that didn't take into account discretionary releases. Let me give you some more evidence. Shanahan. If we say that he couldn't, that he had to follow the Army Corps and assume that the Army Corps protocol would control, is Bettendent right? No, because he wouldn't be addressing nondrought conditions where we're going to get benefits with additional water coming through. The evidence. Bettendent did it on just drought conditions? That's what the focus. The evidence is that water is going to come through the United States. So why does the special master rely upon it with the nondrought situation? Your Honor, in the context of that discussion, I don't think that reliance on that can support the conclusion that this case should end. If I could give you some more evidence. Shanahan direct at paragraph 60 explains the water that goes through. Shanahan's testimony, page 2523, says the water is going to go through. Allen, paragraph 85, says even modest amounts will help flora. Justice Ginsburg, you're right. Even just preventing the situation from worsening is going to provide redress. Hornberger addresses that at paragraphs 125 to 126. When it comes to what Congress has said, what I would point to is a statute that my friend, Mr. Kneedler, neglected, but the United States pointed to in its post-trial, its motion to dismiss brief, where it said that there's no reason to assume that the Court would ignore a decree. And it pointed to the compact statute passed in 1997 where Congress directed Federal officials to the maximum extent possible to help facilitate the State's agreed-upon allocation formula. There's no reason to presume that the Court would treat a decree by this Court any differently. We would ask this Court to decline the special master's recommendation. Thank you, Your Honors. Roberts. Thank you, counsel. The case is submitted.